UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

   Plaintiff,

 vs.         REPORT AND RECOMMENDATION

Steven Scott Gordon,

    Defendant.    Crim. No. 05-148 (PAM/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the following Motions of the Defendant Steven Scott Gordon ("Gordon"):

  1.  Gordon's Motion to Dismiss Indictment.

  2.  Gordon's Motion to Suppress Evidence.

A Hearing on the Motions was conducted on June 30, 2005, at which time, Gordon appeared personally, and by Philip G. Villaume, Esq., and the Government appeared by John R. Marti, Assistant United States Attorney.  For reasons which follow, we

recommend that Gordon's Motion to Dismiss Indictment be denied, and that his Motion to Suppress Evidence be denied.

## II. Factual Background

As is pertinent to the Motions presented, Gordon is charged with six Counts of bank fraud, in violation of Title 18 U.S.C. §1344; five Counts of providing false statements on loan and credit applications, in violation of Title 18 U.S.C. §1014; seven Counts of forged securities, in violation of Title 18 U.S.C. §513; and seventeen Counts of money laundering, in violation of Title 18 U.S.C. §1957. Each Count of the Indictment includes an allegation that Gordon was aided and abetted by other persons, in violation of Title 18 U.S.C. §2. The alleged violations are said to have occurred from about January of 2000, through in or about June of 2002, in this State and District, and elsewhere. As pertinent to those charges, and to the Motions pending before us, the operative facts may be briefly summarized.[1]

---

[1]Rule 12(e), Federal Rules of Criminal Procedure, provides that "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record." As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion. Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent devel-opment of the

(continued...)

In June of 2005, Jay A. Brunn ("Brunn"), who is a Special Agent with the Federal Bureau of Investigation ("FBI"), submitted applications for two Search Warrants -- namely, one to a Magistrate Judge in the District of North Dakota, for a commercial building located in Davenport, North Dakota, and another to a Magistrate Judge in this District, for a house trailer located in Borup, Minnesota.[2]   See, Government Exhs. 1, and 2.   The addresses are for two businesses, which are identified by signs on the buildings as "Davenport Ag," and "Gordon's Custom Spraying," respectively.   Each Affidavit, in support of the two Search Warrants, contains identical material facts, which we now relate.

In August of 2002, Brunn was contacted by the First National Bank of Mahnomen ("FNB"), the deposits of which are insured by the Federal Deposit Insurance Corporation ("FDIC").   The FNB alleged that Gordon had submitted false and fraudulent applications, financial statements, tax returns, and other documents, in

---

[1](...continued)
facts and law may require.  See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

[2]Although the application for the North Dakota Search Warrant indicates that the Affidavit was sworn out, on June 9, 2004, the year is clearly a clerical error, because the date is stated correctly as June 9, 2005, on both the final page of the Affidavit, as well as on the Search Warrant itself.  See, Government Exh. 1.

connection with several loans that had subsequently defaulted.  As a result, Brunn began an investigation, in October of 2002.  Brunn discovered that Gordon operated several farming-related businesses in both Minnesota and North Dakota, which included Gordon Farms, Gordon Custom Spraying, Borup Ag Inc., Davenport Ag, and Gordon FLP.  Between the years of 2000 and 2001, Gordon obtained loans from the FNB, totaling in excess of $1,500,000.00, all of which had defaulted, or had not been repaid.  In connection with those loans, Gordon submitted various documents, including tax returns, which were purported to have been prepared by Dennis Marcussen ("Marcussen"), who is an accountant.

In May of 2002, Gordon entered into an agreement with the FNB to deposit all proceeds of his sales, which were to be used as payments on the loans.  Instead, Gordon deposited customer receipts at the American Federal Bank ("AFB"), in Ada, Minnesota, under the name of Gordon FLP.  Furthermore, when Brunn contacted Marcussen, and showed him Gordon's tax returns, Marcussen stated that he had not prepared the returns, and that his signature was a forgery.

Brunn interviewed Marcus Gordon ("Marcus"), who is Gordon's son, and who began working with his father's farming business, in 1998 or 1999.  Marcus informed Brunn that he would often prepare financial statements, which were used to obtain

loans, and that his father directed him to change certain figures, such as expenses, liabilities, inventory values, and income, in order to represent that Gordon's business operations were more successful than they were.   Specifically, Gordon instructed Marcus to "falsify the amount of income which was coming in by showing sales that had not occurred or were going to occur at some future point in time," and by "decreas[ing] expenses and mov[ing] expenses to liabilities to improve the profit of the company."   See, <u>Government Exhs. 1, and 2</u>, at ¶9.  Marcus admitted to preparing false income tax statements, which Gordon submitted to the FNB.  The tax returns, and financial statements, were prepared on a computer that was used by both Gordon and Marcus.   Additionally, Marcus related that, in connection with Borup Ag and Davenport Ag, Gordon and his partner -- namely, Steve King ("King") -- would falsify seed test results, in order to show higher germination rates, or lower weed content, in order to make the seed more valuable, and those false test reports were also generated by the use of the computer.

Marcus advised Brunn that, as of April of 2002, Gordon maintained his records in Borup, Minnesota, at the office of Gordon Custom Spraying, and at the family farmhouse located near Borup, Minnesota.  On May 26, 2005, Brunn traveled to the location of Gordon Custom Spraying, where he observed the following items: 1)

several filing cabinets, which appeared to contain records; 2) papers on the floor, which appeared to be invoices or other records; and 3) an open closet, which appeared to contain boxed records.   The business appeared to be unused, and abandoned.   In addition, Brunn visited the farmhouse, on that same date, and spoke to the current residents, who advised Brunn that Gordon no longer lived there, that there were no business records stored at that location, and that Gordon currently operated a business in Davenport, North Dakota.   Brunn averred that Marcus had told him that Gordon also maintained records at Davenport Ag, in Davenport, North Dakota.

Brunn also related that, since April of 2003, he had been receiving information from a confidential reliable source ("CS-1"), who was in a position to provide information on Gordon's past, and current activities.   Brunn stated that he had corroborated the information provided by CS-1, when possible, that the information had been accurate, and that the individual had never provided false information.  In May of 2005, CS-1 told Brunn that Gordon conducted a business at Davenport Ag, in Davenport, North Dakota, which Brunn observed to be a business that was open and operating, and at which Gordon was working.  Upon conducting a North Dakota driver's license check on Gordon, Brunn discovered that Gordon's address is listed

as the same address as Davenport Ag.  Finally, Brunn averred that Gordon had been

indicted, on May 2, 2005, by a Federal Grand Jury in Minnesota, on charges of bank

fraud, false statements to a bank, forged securities, and money laundering.  Brunn

applied for the Warrants on June 7, and June 9, 2005, and they were both executed on

June 10, 2005.

III.  <u>Discussion</u>

Gordon seeks the dismissal of the Federal Indictment, which was returned

against him.  In addition, Gordon requests that we review the four corners of the two

Search Warrants for probable cause.  We address the Motions, in turn.

A.  <u>Gordon's Motion to Dismiss the Indictment</u>.

1.  <u>Standard of Review</u>.  Rule 12(b), Federal Rules of Criminal

Procedure, allows our consideration, at the pretrial stage, of any defense "which is

capable of determination without the trial of the general issue."  To withstand a Motion

to Dismiss, an Indictment must allege that the Defendant performed acts which, if

proven, would constitute a violation of the law under which he has been charged.

<u>United States v. Polychron</u>, 841 F.2d 833, 834 (8th Cir. 1988).  As a result, if the acts,

that have been alleged in the Indictment, do not constitute a criminal offense, then the

Indictment should be dismissed.  See, e.g., <u>United States v. Coia</u>, 719 F.2d 1120,

- 7 -

1123 (11ᵗʰ Cir. 1983), cert. denied, 466 U.S. 973 (1984).  In reviewing the sufficiency of an Indictment, or of any of its Counts, we are to determine whether the Indictment sufficiently sets forth the elements of the offenses alleged, where the offenses are said to have occurred, in order to place the Defendant on fair notice as to the charges against him, and whether it enables the Defendant to assert an acquittal or conviction so as to invoke his privilege against double jeopardy for a single offense.  Hamling v. United States, 418 U.S. 87, 117 (1974); United States v. Hall, 20 F.3d 1084, 1087 (10ᵗʰ Cir. 1994).

In determining whether an Indictment has sufficiently set forth the elements of the offense charged, the Indictment will generally be deemed sufficient "'unless no reasonable construction can be said to charge the offense.'"  United States v. Morris, 18 F.3d 562, 568 (8ᵗʰ Cir. 1994), quoting United States v. Peterson, 867 F.2d 1110, 1114 (8ᵗʰ Cir. 1989).  In making this assessment, "[a]n indictment should be tested solely on the basis of the allegations made on its face, and such allegations are to be taken as true."  United States v. Hall, supra at 1087, citing United States v. Sampson, 371 U.S. 75, 78-79 (1962); see also, United States v. Barker Steel Co., Inc., 985 F.2d 1123, 1125 (1ˢᵗ Cir. 1993); United States v. Cadillac Overall Supply Co., 568 F.2d 1078, 1082 (5ᵗʰ Cir. 1978).

- 8 -

Ordinarily, the Court's assessment is limited to the "four corners" of the Indictment, and the Court should studiously avoid the consideration of evidence from sources beyond the Indictment. United States v. Hall, supra at 1087. However, it is permissible, and even desirable in certain circumstances, for the Court to examine the factual predicates of an Indictment, particularly where material facts are undisputed, in order for the Court to ascertain whether the elements of the criminal charge can be shown. Id.; United States v. Brown, 925 F.2d 1301 (10th Cir. 1991).

2.   Legal Analysis.   Gordon contends that the Indictment must be dismissed, because it is "insufficient."   Gordon mainly addresses "the conspiracy count," which he argues "provides no factual statement which would form the basis of any conspiratorial agreement," nor any "information regarding the facts which the government intends to prove as the overt acts committed by the Defendant."   See, Docket No. 12.   In addition, Gordon contends that the substantive Counts are also insufficient, in that they allege "only large sums of money and broad time periods." Id.   The Government argues that the Motion is without merit, because the Indictment does not allege a conspiracy Count.   After reviewing the Indictment, we agree that

there is no Count, which alleges a conspiracy by Gordon,[3] and we turn to an analysis

of the substantive Counts in the Indictment.

As noted, in order to be sufficient, an Indictment must contain an allegation as

to every essential element of the crime charged.  See, <u>Russell v. United States</u>, 369

U.S. 749, 763-64 (1962).   Here, the Indictment contains several introductory

paragraphs, in which the general nature of Gordon's alleged crimes is set forth.  As

explained in those paragraphs, the FNB is a financial institution, whose deposits are

insured by the FDIC, and the Small Business Administration ("SBA") is a department,

and agency of the United States, which guarantees loans provided by financial

institutions.  See, <u>Docket No. 1</u>, at ¶¶3-4.  In the Spring of 2000, and thereafter,

Gordon applied to the FNB for a series of loans, which included a loan in the amount

of $950,000.00, that was guaranteed by the SBA.  <u>Id.</u> at ¶5.  It is alleged that Gordon

"provided false and fraudulent applications, tax returns, financial statements, and other

documents," in order to secure the loans.  <u>Id.</u>  Gordon also secured a loan from the

FNB, which was secured by payments received from the Agricultural Chemical

---

[3]Although each Count alleges that Gordon was aided and abetted by another
person, or persons, in violation of Title 18 U.S.C. §2, that allegation does not
comprise its own separate Count, nor does it affect the sufficiency of the substantive
Counts.

- 10 -

Response and Reimbursement Account ("ACRRA"), on the condition that Gordon applied all of the ACRRA payments against the loan.  Id. at ¶6.  Finally, after Gordon's son obtained a loan from Ag Services of America, which was secured, in part, by crop insurance payments from the Rural Community Insurance Services ("RCIS"), Gordon allegedly forged endorsements on the checks, which he then diverted to his own use.  Id. at ¶7.

In Counts 1 through 6, Gordon is charged with bank fraud, in violation of Title 18 U.S.C. §1344, which makes it a crime to "knowingly execute[], or attempt[] to execute, a scheme or artifice -- (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises."  Following the preliminary paragraphs, the remainder of the Indictment closely tracks the statutory offenses, with which Gordon is charged.  Thus, in Counts 1 through 6, Gordon is charged with having "devised a scheme and artifice to defraud the First National Bank of Mahnomen and the SBA, and to obtain money, funds and credits owned by and under the custody and control of the First National Bank of Mahnomen and the SBA, by means of false and fraudulent pretenses, representations and promises."  See, Docket No. 1, at ¶9.  In addition, the

- 11 -

Indictment describes the nature of Gordon's scheme, its purpose, and its execution. Id. at ¶¶10-14.  The Indictment lists specific dates for four of the six Counts, and a range of dates for the remaining two Counts of bank fraud, as well as the amounts of the disbursements, or diverted funds, from either the FNB or the SBA.

In Counts 7 through 11, Gordon is charged with making false statements on loan and credit applications, in violation of Title 18 U.S.C. §1014.  Section 1014 makes it unlawful to "knowingly make[] any false statement or report, or willfully overvalue[] any land, property or security, for the purpose of influencing in any way the action" of the various enumerated Government Agencies, such as certain Federal financial institutions, and institutions that have accounts insured by the FDIC.  With regard to those Counts, it is alleged that Gordon "knowingly made and caused to be made material false statements for the purpose of influencing the action of a financial institution, the First National Bank of Mahnomen, whose deposits were insured by the Federal Government, in connection with an application, agreement, commitment, and loan, and a change and extension of the same by renewal and deferment of action." See, Docket No. 1, at ¶17.  For each of the five Counts, the Indictment specifies the date, or year, of the transaction, the document involved, and the false statement, or action that Gordon made.

- 12 -

In Counts 12 through 18, Gordon is charged with forged securities, in violation of Title 18 U.S.C. §513, which states, in pertinent part, that "whoever makes, utters or possesses a forged security of a State or political subdivision thereof or of an organization, with intent to deceive another person, organization, or government" has committed a crime punishable by law.  Within the meaning of Section 513, a "security" includes a "check", and an "organization" is "a legal entity, other than a government, established or organized for any purpose, and includes a corporation, company, association, firm, partnership, joint stock company, foundation, institution, society, union, or any other association of persons which operates in or the activities of which affect interstate or foreign commerce."  See, Title 18 U.S.C. §513(c)(3)(A), and (4). Similarly, it is alleged that Gordon "did make, utter and possess a forged security, that is, a check described below with forged endorsements which were payable from the [RCIS] * * * which checks were of an organization that operates in and the activities of which affect interstate commerce * * * with the intent to deceive another person and organization, that is, the [FNB]."  See, Docket No. 1, at ¶20.  The Indictment specifies the dates of the forged endorsements, the check numbers, and amounts, the individuals to whom the checks were payable, and the name of the forged endorsement -- namely, Linda Ohrt, of Ag Services of America.

Finally, in Counts 19 through 35, it is alleged that Gordon committed money laundering, in violation of Title 18 U.S.C. §1957, which makes it a crime to "knowingly engage[] or attempt[] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specific unlawful activity." The terms "monetary transaction," "criminally derived property," and "specific unlawful activity," are further defined in Section 1957(f). As to those Counts, it is alleged that Gordon "knowingly engaged and attempted to engage in monetary transactions affecting interstate commerce in criminally derived property of a value greater than $10,000.00, such property having been derived from specified unlawful activity, that is bank fraud, false statements to banks, and forged securities." See, Docket No. 1, at ¶23. Once again, the Indictment sets forth the specific dates of the transactions, for each Count, as well as the type, and amount of the transaction.

In sum, the Indictment, here, fairly provides Gordon with notice of the crimes with which he is being charged, and therefore, we follow the general rule, that Indictments, which allege the essential elements of a charged offense, are legally sufficient. See, United States v. Broncheau, 597 F.2d 1260 (9th Cir. 1979). While Gordon may believe that the facts of this case do not sustain the Government's allegations, we are not empowered, by virtue of the legal sufficiency of the Indictment,

to resolve a factual matter, which would impermissibly draw us into an adjudication of a general Trial issue. See, Rule 12(b), Federal Rules of Criminal Procedure. Accordingly, we recommend that, at this preliminary stage, Gordon's Motion to Dismiss be denied.

      B.    Gordon's Motion to Suppress Evidence.

      1.    Standard of Review. The Fourth Amendment requires that "a search warrant must be issued by a neutral and detached magistrate," Technical Ordnance Inc. v. United States, 244 F.3d 641,  647 (8th Cir. 2001), citing Johnson v. United States, 333 U.S. 10, 13-14 (1948), who will "assess the underlying factual circumstances so as to ascertain whether probable cause exists to conduct a search or to seize incriminating evidence, the instrumentalities or fruits of a crime, or contraband."  United States v. Winningham, 953 F. Supp. 1068, 1077 (D. Minn. 1996), citing Warden v. Hayden, 387 U.S. 294 (1967); United States v. Johnson, 64 F.3d 1120, 1126 (8th Cir. 1995).  A finding of probable cause must be based upon a consideration of all of the circumstances set forth in the supporting Affidavit, and is proper when a "fair probability [exists] that * * * evidence of a crime will be found in a particular place," or when "'a substantial basis [exists] for * * * conclud[ing]' that a search would uncover evidence of wrongdoing." United States v. Horn, 187 F.3d

781, 785 (8th Cir. 1999), quoting Illinois v. Gates, 462 U.S. 213, 236, 238 (1983), quoting, in turn, Jones v. United States, 362 U.S. 257, 271 (1960); see also, United States v. Gladney, 48 F.3d 309, 313 (8th Cir. 1995); United States v. Tagbering, 985 F.2d 946, 949 (8th Cir. 1993).

Probable cause is "a fluid concept -- turning on the assessment of probabilities in particular factual contexts" and, as such, is "not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, supra at 232; see also, Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 435 (2001); Ornelas v. United States, 517 U.S. 690, 697 (1996). In considering the issuance of a Search Warrant, probable cause must be viewed under a reasonableness standard, "the touchstone of the Fourth Amendment," which "is measured in objective terms by examining the totality of the circumstances." Ohio v. Robinette, 519 U.S. 33, 39 (1996), quoting Florida v. Jimeno, 500 U.S. 248, 250 (1991).

Search Warrant "[a]pplications and affidavits should be read with common sense and not in a grudging, hyper technical fashion." Walden v. Carmack, 156 F.3d 861, 870 (8th Cir. 1998); United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993). "In conducting such an examination, the Court should review the affidavits as a whole, and not on a paragraph-by-paragraph basis." United States v. Winningham, supra at

- 16 -

1077, citing United States v. Anderson, 933 F.2d 612, 614 (8th Cir. 1991); United States v. Townsley, 843 F.2d 1070, 1076-77 (8th Cir. 1988).   Under the Fourth Amendment's preference for searches conducted pursuant to Warrants, see, Illinois v. Gates, supra at 236, Courts reviewing Search Warrants are to "accord great deference to the decision of the Judicial Officer who issued the Warrant," and must not engage in a de novo review.   United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1995); see also, Walden v. Carmack, supra at 870.

2.      Legal Analysis.   At the Hearing on the Motions, Gordon requested that we review the Search Warrants, in order to determine whether they were supported by a sufficient showing of probable cause.   Our review of the Search Warrants, and their underlying applications, confirms the appraisal of the issuing Judicial Officers, that ample probable cause supported the issuance of the Warrants, and further, that the Warrants were not otherwise fatally defective.   We must address two primary issues, in our analysis of the Warrants -- namely, whether the information provided by Marcus, and CS-1 was reliable, and whether the information was fatally stale.

a.      Whether the Information was Reliable.   We recognize that much of the information supporting the Search Warrants came from Marcus, and that

- 17 -

additional information was obtained from a confidential informant -- namely, CS-1.

When probable cause for an arrest is based on information provided by an informant,

"'a key issue is whether that information is reliable.'"   United States v. Koons, 300

F.3d 985, 993 (8th Cir. 2002), quoting United States v. Fulgham, 143 F.3d 399, 401

(8th Cir. 1998); see also, United States v. Reivich, 793 F.2d 957, 959 (8th Cir.

1986)("[T]he informant's reliability, veracity, and basis of knowledge are relevant

considerations -- but not independent, essential elements -- in finding probable

cause.").  As our Court of Appeals has stated:

> In [Illinois v.] Gates, the Supreme Court explained that an
> informant's reliability and basis of knowledge "are better
> understood as relevant considerations in the totality-of-the-
> circumstances analysis that traditionally has guided
> probable-cause determinations:  a deficiency in one may be
> compensated for, in determining the overall reliability of a
> tip, by a strong showing as to the other, or by some other
> indicia of reliability." * * * 462 U.S. at 233, 103 S.Ct. at
> 2329.

United States v. Olson, 21 F.3d 847, 850 (8th Cir. 1995).

As a result, "'an informant's basis of knowledge [is] an important consideration, but

not a rigid requirement, in the probable cause determination.'"   Id., citing United States

v. Anderson, 933 F.2d 612, 615 (8th Cir. 1991).

Consequently, the "core question" is whether the information provided by the informant was reliable. See, United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993)("The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable."). Moreover, "[t]he statements of a reliable confidential informant are themselves sufficient to support probable cause." United States v. Wright, supra at 975. In turn, an informant is deemed reliable when his/her statements are corroborated by independent evidence. See, United States v. Carpenter, 341 F.3d 666, 669 (8th Cir. 2003) ("[C]orroboration of minor, innocent details may support finding of probable cause."), citing United States v. Tyler, 238 F.3d 1036, 1039 (8th Cir. 2001); see also United States v. Koons, 300 F.3d 985, 993 (8th Cir. 2002)("'Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence.'"), quoting United States v. Fulgham, 143 F.3d 399, 401 (8th Cir. 1998); United States v. Formaro, 152 F.3d 768, 770 (8th Cir. 1998)("[C]orroboration of the confidential informant's information by independent investigation is an important factor in the calculus of probable cause.").

Here, Marcus was the substantial source of Brunn's investigation, and the information that he provided undergirds our finding that the Search Warrants were supported by probable cause.  Marcus was directly involved in Gordon's allegedly fraudulent activities, and therefore, he had specific knowledge of the facts that he related to Brunn.  In addition, the statements that he made were against his penal interest, as he implicated himself in the fraudulent activities of his father. See, United States v. Allen, 297 F.3d 790, 794-95 (8th Cir. 2002)("[E]ven though [the informant] had no record as an informant, the information he provided was sufficiently credible both because his statements were against his penal interest and because the police were able to corroborate some of the information he provided."), citing United States v. Tyler, supra at 1039.

With regard to CS-1, Brunn averred that he was able to corroborate the information that s/he provided, such as the fact that Gordon conducted a business, known as Davenport Ag, in Davenport, North Dakota.  As we have noted, even the "corroboration of minor, innocent details may support a finding of probable cause." United States v. Carpenter, supra at 669; United States v. Reivich, supra at 959-60 (same); see also, United States v. Williams, supra at 593 ("If [some] information from an informant is shown to be reliable because of independent corroboration, then it is

- 20 -

a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable."). Furthermore, Brunn averred that CS-1 had never provided false information to Brunn, in the past. Therefore, we conclude that Brunn justifiably relied upon the information that was provided by Marcus, and CS-1, and that such information is sufficient to establish probable cause for the Search Warrants.

       b.   <u>Whether the Information was Fatally Stale</u>. It is axiomatic that, at the time a Search Warrant is issued, there must be probable cause to support its issuance. See, <u>United States v. Ozar</u>, 50 F.3d 1440, 1446 (8th Cir. 1995), cert. denied, 516 U.S. 871 (1995). Therefore, a lapse of time, between the observations of a witness and the issuance of a Search Warrant, like a delay in executing a Search Warrant, "may make probable cause fatally stale." <u>United States v. Maxim</u>, supra at 397 [quotations omitted].

"There is no bright-line test for determining when information is stale," and the passage of time alone is "not always the controlling factor," as other factors, such as "the nature of the criminal activity involved and the kind of property subject to the search," are also relevant to the inquiry. <u>Id.</u>, quoting <u>United States v. Koelling</u>, 992 F.2d 817, 822 (8th Cir. 1993); <u>United States v. Rugh</u>, 968 F.2d 750, 754 (8th Cir.

1992); see also, United States v. Chrobak, 289 F.3d 1043, 1046 (8th Cir. 2002); United States v. LaMorie, 100 F.3d 547, 554 (8th Cir. 1996).  As but one example, when the Affidavit alleges an "ongoing continuous criminal enterprise, the passage of time between the receipt of information and the search becomes less critical in assessing probable cause."  United States v. Rugh, supra at 754.  Therefore, in our analysis, we must not "simply count[] the number of days between the occurrence of the facts supplied and the issuance of the affidavit," but must consider any passage of time "in the context of a specific case and the nature of the crime under investigation."  United States v. Maxim, supra at 397, quoting United States v. Koelling, supra at 822. Furthermore, "'where recent information corroborates otherwise stale information, probable cause may be found.'"  United States v. Ozar, supra at 1446, quoting United States v. Macklin, 902 F.2d 1320, 1326 (8th Cir. 1990), cert. denied, 498 U.S. 1031 (1991).

We find that the information included in Brunn's Affidavits is not fatally stale. While it is true that the facts recited in the Affidavit date back several years prior to the execution of the Search Warrants, we must consider the "nature of the criminal activity involved and the kind of property subject to the search."  See, United States v. Maxim, supra at 397, citing United States v. Rugh, supra at 754.  "Where, as here, the

- 22 -

supporting affidavit presents a picture of continuing conduct, as opposed to an isolated instance of wrongdoing * * * the passage of time between the last described act and the presentation of the application becomes less significant." United States v. Gigante, 979 F. Supp. 959, 964 (S.D.N.Y. 1997)(holding that a wiretap application was supported by probable cause, even though most of the information was at least three to five years old)[internal quotations omitted].

Here, Brunn's Affidavit relates multiple acts of fraudulent activity, by Gordon, which spanned at least the three (3) years from 2000 to 2002. The presence of a continuing operation lessens the likelihood that the information had become stale. See, United States v. Ozar, supra at 1446 (finding that a Search Warrant was supported by probable cause, where the majority of the information was from two to four years earlier, and the information, which suggested more recent, ongoing criminal activity, was speculative, and noting that "[t]he passage of time is less significant when there is cause to suspect continuing criminal activity"); United States v. Williams, 897 F.2d 1034, 1039 (10th Cir. 1990)(holding that probable cause supported the Search Warrant, even though some of the information in the Affidavit was four years old, where the defendant was connected to an "ongoing conspiracy spanning a number of years"). Furthermore,"[i]n the case of a search of a business for business records or inventory,

- 23 -

it is especially true that information does not quickly become stale." United States v. Culp, 1996 WL 596548 at *2-3 (N.D.N.Y. 1996), citing Andresen v. Maryland, 427 U.S. 463, 478 n. 9 (1976); United States v. Glass Menagerie, Inc., 721 F. Supp. 54, 58-59 (S.D.N.Y. 1989)(holding that two and a half year old information supported a probable cause finding, because the search was of an ongoing business, and written records were likely to exist).

Here, the evidence being sought in the Search Warrant were primarily business, and financial documents.  Thus, it is likely that Gordon's business and financial records were still maintained on the premises to be searched, and the information in the Affidavit, which related to events that occurred from 2000 to 2002, was not fatally stale.  See, United States v. Cherna, 184 F.3d 403, 410 (5th Cir. 1999)("Although many of the misrepresentations described in [the] affidavit took place * * * one to two years" prior to the application for the Search Warrant, "we cannot say that [the] affidavit was based on stale information," because the businesses were ongoing, and "financial records typically are retained for long periods of time."); United States v. Brownderville, 187 F.3d 638, 1999 WL 618067 (6th Cir., August 2, 1999)(finding probable cause to support a Search Warrant, where the information established that the defendant's gross proceeds on his tax returns filed for the previous two to four

years, were significantly lower than what they should be, because, inter alia, "the crime was ongoing and the evidence was not likely to have disappeared," and the "defendant's doctoring of his business records to understate his income was an established practice."). Furthermore, in the two weeks prior to his applications for the Search Warrants, Brunn visited each of the locations to be searched, and he confirmed that, at Gordon's Custom Spraying, it appeared that records were still being stored, and that Davenport Ag was a business that was open and operating, and at which Gordon was observed working.

Here, the totality of the circumstances, that were fully elaborated in Brunn's Affidavit, provided the Judicial Officers with substantially more than a plausible basis to believe that Gordon's financial practices were not legal, and that violations of the Federal laws would be revealed in an inspection of his business and personal records. Applying a practical, common sense reading to Brunn's Affidavit, we find an abundance of probable cause to believe that the execution of the Search Warrants at Gordon's residence and business offices would uncover the evidence of a crime. Indeed, in our considered view, given the comprehensiveness of the Affidavit's factual recitations, a "prudent person" could not reach a contrary finding. Accordingly, we conclude that the Search Warrants were issued upon a compellingly cogent showing

of probable cause, and therefore, we recommend that Gordon's Motion to Suppress Evidence be denied.[4]  See also, United States v. Cherna, supra at 410-11 ("[T]here could be * * * innocent explanations for the evidence * * *, but an affidavit need not present a watertight criminal case.").

NOW, THEREFORE, It is --

RECOMMENDED:

1.      That the Defendant's Motion to Dismiss Indictment [Docket No. 11] be denied.

2.      That the Defendant's Motion to Suppress Evidence [Docket No. 26] be denied.

Dated: July 25, 2005                    s/Raymond L. Erickson
                                        Raymond L. Erickson
                                        UNITED STATES MAGISTRATE JUDGE

_____

[4]Furthermore, we would be compelled, by the law of this Circuit, to find that the officers' reliance upon the Search Warrant was reasonable, because it "was not so facially lacking in probable cause as to preclude the executing officers' good faith reliance thereon." United States v. McNeil, 184 F.3d 770, 775 (8th Cir. 1999), citing United States v. Leon, 468 U.S. 897, 922-23 (1984).  Here, acting independently, two United States Magistrate Judges concluded that the Warrants were lawful, and we could not reasonably expect law enforcement officers to assess the lawfulness of the Warrants differently.

**NOTICE**

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than August 11, 2005**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than August 11, 2005**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.